### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KIMBERLY BRIMER,                ) <br> MATTHEW BRIMER,                ) <br> and CHRISTOPHER BRIMER,     ) <br>                                                  ) <br>         Plaintiffs,                          ) <br>                                                  ) <br> v.                                             ) <br>                                                  ) <br> LIFE INSURANCE COMPANY OF )<br> NORTH AMERICA,                    ) <br>                                                  ) <br>         Defendant.                         ) | Case No. 07-CV-453-GKF-PJC |

## OPINION AND ORDER

Plaintiffs Kimberly Brimer ("Kimberly"), Matthew Brimer ("Matthew"), and Christopher Brimer ("Christopher") (collectively, "Brimer Family") bring this suit under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA"), seeking judicial review of the decision to deny them benefits under the Voluntary Accident Policy ("Policy") purchased by James Brimer ("James") from the defendant Life Insurance Company of North America ("LINA").

### I. Background

Plaintiffs filed this action seeking to recover benefits and enforce their rights under ERISA. Plaintiffs Kimberly Brimer, Matthew Brimer, and Christopher Brimer are respectively the widow and sons of the late James Brimer. The Brimer Family challenges the decision of defendant LINA to deny them benefits under the Voluntary Accident Policy purchased by James Brimer. Prior to his death, James was employed by American Airlines, and through this employment purchased a Voluntary Accident Policy from defendant LINA, a subsidiary of CIGNA Corporation. At all relevant times James was an insured under the Policy.

### A. Terms of the Policy

The Policy provides, in relevant part, that LINA will "pay benefits for loss from bodily injuries: a. caused by an accident which... directly and from no other causes, result[s] in a covered loss..." (AR 025)[1]. The obligation to pay benefits is limited by several specific and enumerated exclusions, however, which include in relevant part: "[n]o benefits will be paid for loss resulting from:

> 6. . . . loss covered by or resulting from sickness, disease, bodily infirmity or medical or surgical treatment thereof . . .
>
> 7. Voluntary self-administration of any drug or chemical substance not prescribed by, and taken according to the directions of, a licensed physician. (Accidental ingestion of poisonous substance in [sic] not excluded.)

(AR 028).[2]

### B. Administrative Record Regarding James' Brimer's Death

Kimberly, Christopher, and Matthew Brimer were out of town the weekend of James' death. (AR 127). James worked on Friday, March 24, 2006 (AR 101) and had a telephone conversation

---

[1] The Administrative Record can be found at Dkt. # 28-2. Page references are to the LINA bates numbering in the bottom right corner of each page.

[2] LINA also denied the claim for benefits during the administrative appeal phase of this litigation under Exclusion 1, which states in relevant part that no benefits will be paid for loss resulting from "[i]ntentionally self-inflicted injuries, or any attempts thereat." (AR 028). LINA does not pursue this basis for denying benefits in this suit, and thus waives that basis for denying benefits.

with Kimberly that evening (AR 130). On Sunday, March 26, 2006, Kimberly and Matthew returned home around 10:05 pm and found James laying on the kitchen floor. (AR 127). Kimberly called 911 and upon arrival, Owasso medics pronounced James dead on the scene. (AR 127). Owasso Police Officer Jason Woodruff also responded and contacted James' physician, Dr. Christopher Klotz, who denied any knowledge of a medical condition that may have contributed to or caused James' death. (AR 127-28). Dr. Klotz reported that James was prescribed pain medication that was usually administered to him by his wife, and stated that if James' wife was out of town, James may have taken more than the recommended amount of the medication. (AR 127). Dr. Klotz declined to sign the death certificate without more information about the circumstances of James' death. (AR 127-28).

Police officer Tony Klahr observed dried "foam cap" on James' face/chin and t-shirt, and that the body was currently in a state of purging. (AR 130). Officer Klahr reported James' Soma (carisoprodol) prescription bottle was present on the kitchen table, with only 67 out of 100 capsules in the prescription remaining. (AR 131). The prescription label indicated the prescription had been filled/dispensed only two days prior on Friday, March 24, 2006. (*Id.*) Officer Klahr stated that "[p]roviding that left over tablets from a previous script, or other unknown source, were not added to the current bottle, 33 tablets had been removed, and presumably ingested by the decedent, within a 48 hour, or less, time period." (*Id.*). Officer Klahr added, "[t]his is also commensurate with the 'foam cap' on the bodily remains, which generally is indicative of a sedative overdose." (*Id.*).

An autopsy was performed on March 27, 2006. (AR 167). The Medical Examiner's Report of Laboratory Analysis,ticketed June 14, 2006, indicates James' femoral blood tested positive for hydrocodone (less than 0.10 MCG/ML), codeine – 2.0 MCG/ML, carisoprodol – 6.9 MCG/ML, and

3

Meprobamate – 37.1 MCG/ML, and his heart blood tested positive for diazepam, nordiazepam, and acetaminophen. (AR 151). The report closes with a comment stating "significant codeine with other CNS depressants." (*Id*.).  James had prescriptions for diazepam, codeine, and carisoprodol. (AR 136-142). On June 26, 2006, Officer Richard Parsley reported receiving the Medical Examiner's report, prepared by Andrew Sibley, M.D., which stated: "[d]eath of this man with a history of hypertension and back pain was due to acute combined drug toxicity. There were no significant injuries. The manner of death is classified as accident." (AR 132, 150). The Medical Examiner's Report of Autopsy, dated June 21, 2006, states the "Cause of Death" as "Acute combined drug toxicity." (AR 167). The police closed the investigation after receiving this report. (AR 132). According to James' Certificate of Death, dated July 13, 2006, the "Immediate Cause" of death is described as "Acute Combined Drug Toxicity" due to "Codeine, Diazepam, Carisoprodol, Hydrocodone." (AR 143, 166).  The "Manner of Death" is described as "Accident." (AR 143). There is no indication in the record of any external injury. (See AR 169, 172).

**C.    Claim Denial and Administrative Procedural History**

Following James' death, plaintiffs submitted a claim for loss under the Policy. (AR 181). LINA responded by letter dated November 21, 2006, acknowledging the claim and indicating that more information was needed. (AR 178-80). LINA subsequently requested information from the Tulsa County Medical Examiner (AR 110-19; 159, 165), and the Owasso City Police Department (AR 120-34; 162), as well as information relating to James' prescriptions (AR 135-42) in order to process the claim. LINA sent letters dated December 6, 2006, to the Brimer Family seeking more information related to James' prescription medications. (AR 152, 155, 157).  On January 5, 2007,

LINA informed the Brimers by letter that "[t]his information is currently being reviewed by an independent toxicologist to determine whether or not Mr. Brimer was taking his medication as prescribed." (AR 105).

LINA requested a toxicology report from Toxicologist Frederick W. Fochtman, Ph.D. (AR 108). By letter dated January 28, 2007, Dr. Fochtman, upon review of the relevant information in LINA's file, stated his opinion that "[t]he concentration found for codeine is consistent with a lethal dose." (AR 102). Moreover, Dr. Fochtman stated his "opinion with a reasonable degree of scientific certainty that Mr. Brimer had not taken carisoprodol according to his prescribed dosage. The concentrations of codeine, carisoprodol, and meprobamate found in Mr. Brimer's post-mortem blood are greater than what would be expected with therapeutic doses." (AR 103).

LINA informed the Brimer Family that their claim for benefits had been denied in a letter dated February 2, 2007. (AR 086). LINA based its initial denial on Exclusion 7 of the Policy, and added that "[n]othing contained in this letter should be construed as a waiver of any rights of defenses under the policy. The determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specially mentioned herein." (AR 086-88). Plaintiffs appealed this decision by a letter dated March 22, 2007, and argued that Exclusion 7 applied only to non-prescription drugs. (AR 082). Over the next month LINA sent the claim file to plaintiffs and twice requested any additional information for the appeal but none was submitted. (AR 077-80).

On July 12, 2007, LINA completed the administrative appeal and denied the Brimer Family's claim for benefits on four grounds: 1) that James' death was not an "accident" within the meaning of the policy, 2) Exclusion 1 applied, 3) Exclusion 6 applied, and 4) Exclusion 7 applied. (AR 060-

62). The plaintiffs instituted this action under ERISA appealing LINA's denial of benefits on July 23, 2007. (Dkt. #1). Plaintiffs also argue that LINA may only base its denial of benefits on Exclusion 7 because that was the only grounds for denial communicated to plaintiffs prior to the administrative appeal. (Dkt. #30, p.15).

## II. Procedural Legal Analysis

**A.     Standard of Review**

The court must "review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2348 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits ... is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."). If the plan does not explicitly reserve discretionary authority to determine eligibility or to construe the terms of the plan to the plan administrator, then "the *de novo* standard of review applies regardless of whether... the administrator or fiduciary is operating under a possible or actual conflict of interest." *Firestone*, 489 U.S. at 115.

The Policy does not explicitly reserve discretionary authority to LINA. (AR 025-55). The *de novo* standard applies regardless of whether LINA did or did not have a conflict of interest in denying benefits under the Policy. LINA concedes that the *de novo* standard of review is appropriate. (Dkt. #32, p.5). The *de novo* standard of review gives zero deference to LINA's administrative decision to deny benefits, and is more favorable to plaintiffs than the "arbitrary and capricious" or "abuse of discretion" standards that plaintiffs advocate in their briefs.

**B.     Burden of Proof**

The claimant bears the initial "burden of proving the occurrence of a covered loss." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009). The "basic rule of insurance law provides that the insured has the burden of showing that a covered loss has occurred, while the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000).

Plaintiffs thus bear the burden of proving that James' death was an "accident" under the Policy and thus a covered loss. If that initial burden is met, then the burden shifts to defendant LINA to prove that one of the Policy exclusions is applicable in order to properly deny benefits.

**C.     Scope of Grounds for Denial of Benefits**

ERISA requires that when an employee benefit plan declines a claim for benefits it must provide "the specific reasons for such denial, written in a manner calculated to be understood by the participant" and to "afford a reasonable opportunity . . . for a full and fair review." 29 U.S.C. § 1133. The Code of Federal Regulations further requires plan administrators and insurance companies to provide to the claimant "the specific reason or reasons for the denial" and "specific references to pertinent plan provisions." 29 C.F.R. § 2560.503-1(f). "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue [a civil action in Federal District Court]." 29 C.F.R. § 2560.503-1(l). Generally courts have found that failure by an insurance company to provide timely notice of all grounds to deny benefits at the administrative stage also entitles plaintiff to provide additional evidence

rebutting those grounds at trial. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871-72 (9th Cir. 2008) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006) (en banc)).

Plaintiffs urge this Court to find that LINA may only base its denial of benefits on Exclusion 7, which was the only grounds for denial that LINA specifically communicated to the Brimer Family prior to the administrative appeal. (Dkt. #30, p.15). Plaintiff argues that "fundamental fairness" requires LINA be held to only to Exclusion 7. (Dkt. #33, p.6). The Court cannot find any legal basis for plaintiffs' argument to restrict LINA to the grounds listed in its initial denial letter. Plaintiffs had ample opportunity to supplement the Administrative Record prior to administrative appeal and to address the new grounds for exclusion in their briefs for this case. Because of this they suffered no prejudice from LINA's untimely notice of the additional grounds for denial of benefits. Under 29 C.F.R. § 2560.503-1(1) the remedy for LINA's untimely notice of the additional grounds for denial is to allow plaintiff to bring this suit and file additional evidence pertaining to the new grounds of denial. Plaintiffs have had that opportunity, and thus no further remedy is necessary.

### III. Substantive Claims

The Court has determined that plaintiffs have not carried their burden to show that James' death was not an "accident" within the meaning of the policy. Even if it was an "accident," benefits were properly denied under Exclusion 6. Because of these two independent grounds to deny the Brimer Family's claim, the Court need not reach the additional Exclusions 1 and 7.

**A)** **Was James' Death an "Accident" under the Policy?**

The Policy provides that LINA will "pay benefits for loss from bodily injuries: a. caused by an accident which happens while an insured is covered by this policy; and b. which, directly and from no other causes, result in a covered loss . . . ." (AR 025). The plaintiff has the burden to prove that James' death was a covered "accident." *Hancock*, 590 F.3d at 1155. In defining plan terms such as "accident" the court must give "the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (quoting *Blair v. Metro. Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992)).

Both parties agree that the Oklahoma Supreme Court's decision in *Cranfill* guides the interpretation of terms of the contract. (Dkt. #30, p.22-23; Dkt. #32, p.16) (citing *Cranfill v. Aetna Life Ins. Co.*, 49 P.3d 703 (Okla. 2002)). The Oklahoma Supreme Court defined "an accident as an event that is 'unexpected, unintended and unforeseen in the eyes of the insured'" and that "the standard to be used is that of a reasonable person appraising the event from the insured's perspective." *Cranfill*, 49 P.3d at 706 (citing *Willard v. Kelley*, 803 P.2d 1124, 1128-29 (Okla. 1990)). The term "unforeseen" is not the same as the tort liability concept of "foreseeability" however. "Unforeseen" specifically means that "[i]t is only when the consequences of the act are so natural and probable as to be expected by any reasonable person that the result can be said to be so foreseeable as not to be accidental." *Id.* (Citing *Mid-Continent Life Ins. Co. V. Davis*, 51 P.2d 319 (Okla. 1935)). Many courts have determined that a medical examiner's determination that the cause of death was an "accident" is generally not dispositive of the issue, because the medical examiner does not necessarily use "accident" within the meaning and limitations contemplated by the policy. *Pedersen v. Union Labor Life Ins. Co.*, 2006 WL 3474183 at *6 (E.D.Wis. Nov. 29, 2006); *see also*

*Mullaney v. Aetna U.S. Healthcare*, 103 F.Supp. 2d 486, 491 (D.R.I. 2000).

In the 48 hours between when James Brimer filled his prescriptions and when he was found dead in his home, the plaintiffs do not contest that he likely consumed at least 33 Soma (carisoprodol) tablets in conjunction with other powerful prescription drugs such as codeine and diazepam. (See Dkt. # 30, 33). Though this was clearly a substantial overdoes, it is unclear from the record whether this represented an overdose of roughly either double or quadruple the prescribed therapeutic amount of Soma. (Dkt. # 32, p.8). Regardless, Dr. Fochtman determined that the Soma levels in James' body were "consistent with greater than therapeutic doses" and that this would have an "additive effect" with the independently "lethal dose" of codeine that was detected. (AR 102).

A reasonable person taking such a significant overdose of prescription drugs could not reasonably believe that serious illness or death were "unexpected, unintended and unforeseen" results of that overdose. When a person ingests a lethal dose of codeine, in addition to other prescription drugs at a rate substantially in excess of the prescription amounts, it must be said that the consequences of that action are "so natural and probable as to be expected by any reasonable person." The fact that the medical examiner and police reports conclude the manner of James' death was an "accident" is not dispositive in the determining eligibility for benefits under the policy. The medical examiner also concludes that the cause of James' death was "due to acute combined drug toxicity." (AR 150). The plaintiffs have presented no evidence or argument, either at the administrative level or to this court, to carry their burden of proving that the consequences of James ingesting powerful prescription drugs in the quantity and speed at which he did are not so natural and probable as to be expected by any reasonable person.

**B)** **Was James' Death Excluded from Coverage as a Sickness, Disease, Bodily Infirmity or Medical Treatment Thereof?**

Exclusion 6 in the Policy provides a proper grounds to deny benefits even if the death was an "accident." (AR 028). Although neither party presents any Tenth Circuit authority on point, the weight of persuasive authority indicates that "[t]he courts have drawn no distinction between medical treatment performed by a doctor, and self-treatment by a patient attempting to follow a doctor's advice, finding the latter to fall within an exclusion for medical treatment just as the former would." 10 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 141:94 (3d ed. 1995); *see also id.* at § 141:91 ("The words 'medical and surgical treatment'. . . not only relate to the activity of the physician or surgeon, but also include those things done by the insured patient to carry out specific directions given by his or her physician for the purpose of effecting a cure or alleviation of his or her condition or illness."). LINA's cited authority is uncontested that "an exclusion in an [insurance] policy for medical treatment of a sickness or disease unambiguously includes death caused by accidentally overdosing on a drug prescribed by a doctor for a medical condition." *Grobe v. Vantage Credit Union*, 679 F.Supp. 2d 1020, 1031-32 (E.D.Mo. Jan. 20, 2010) (citing *Barkerding v. Aetna Life Ins. Co.*, 82 F.2d 358, 359 (5th Cir. 1936)). A policy benefits exclusion for medical treatment applies even if the prescription drug overdose was accidental. *Id.*

The Court is persuaded by the weight of legal commentators, case law, and common sense that overdose on prescription drugs is "medical treatment" within the meaning of the Policy Exclusion 6. Because Exclusion 6 applies to this claim, LINA properly denied benefits under the Policy whether or not James' death was an "accident" within the meaning of the policy.

## IV. Conclusion

For the reasons set forth above, the Court denies plaintiffs' claim and affirms the decision of LINA to deny benefits in this case.

DATED this 13th day of September, 2010.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma