# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KIMBERLY BRIMER, MATTHEW BRIMER, and CHRISTOPHER BRIMER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 07-CV-453-GKF-PJC |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) ) |
| Defendant. | ) ) |

## **OPINION AND ORDER**

Plaintiffs Kimberly Brimer, Matthew Brimer, and Christopher Brimer have filed a Motion for New Trial (Dkt. #38), seeking reversal of the Judgment entered in favor of defendant Life Insurance Company of North America ("LINA"). For the reasons set forth below, the court revises its previous Opinion and Order, but denies the Motion for New Trial because the revisions do not merit a substantive alteration of the Judgment.

### **I. Background**

Plaintiffs Kimberly Brimer, Matthew Brimer, and Christopher Brimer (the "Brimers") are respectively the widow and sons of the late James Brimer. Mr. Brimer was an insured under a group accident policy (the "Policy") purchased through his employer, American Airlines. The Brimers challenge the decision of defendant LINA denying them benefits under the Policy.

**A.     Relevant Terms of the Policy**

The Policy provides that LINA will pay benefits for loss from bodily injuries:

> a.  caused by an accident which happens while an insured is covered by this policy; and
> b.  which, directly and from no other causes, result in a covered loss."

(AR 025)[1]. The obligation to pay benefits is limited by certain specific exclusions which include, in relevant part:

> No benefits will be paid for loss resulting from:
>
> 1.  Intentionally self-inflicted injuries, or any attempt thereat.
>
> . . .
>
> 6.  Benefits will not be paid for loss covered by or resulting from sickness, disease, bodily infirmity or medical or surgical treatment thereof, or bacterial or viral infection, regardless of how contracted. This does not include bacterial infection that is the natural and foreseeable result of an accidental external bodily injury or accidental food poisoning.
>
> 7.  Voluntary self-administration of any drug or chemical substance not prescribed by, and taken according to the directions of, a licensed physician. (Accidental ingestion of a poisonous substance in [sic] not excluded.)

(AR 028).

---

[1] The Administrative Record can be found at Dkt. # 28-1, 28-2, and 28-3. References to the Administrative Record are to the Bates numbers on the bottom right corner of each page.

**B.     Administrative Record Regarding Mr. Brimer's Death**

Kimberly, Christopher, and Matthew Brimer were out of town the weekend of Mr. Brimer's death. (AR 127). Kimberly last heard from her husband when she had a telephone conversation with him on the evening of Friday, March 24, 2006. (AR 121). On Sunday, March 26, 2006, Kimberly and Matthew returned home around 10:05 p.m. and found Mr. Brimer lying on the kitchen floor. (AR 127). Kimberly called 911 and upon arrival, medics pronounced Mr. Brimer dead at the scene. (AR 128). Owasso, Oklahoma Police Officer Jason Woodruff also responded and contacted Mr. Brimer's physician, Dr. Christopher Klotz, who denied any knowledge of a medical condition that may have contributed to or caused Mr. Brimer's death. (AR 127). Dr. Klotz reported that Mr. Brimer was prescribed pain medication that was usually administered to him by his wife, and that, if Mrs. Brimer was out of town, Mr. Brimer may have taken more than the recommended amount of the pain medication. (*Id.*). Dr. Klotz declined to sign the death certificate without more information about the circumstances of Mr. Brimer's death. (AR 127-28).

Police officer Tony Klahr observed dried "foam cap" on Mr. Brimer's face/chin and t-shirt. (AR 130). Officer Klahr reported Mr. Brimer's Soma (carisoprodol – a muscle relaxer) prescription bottle was present on the kitchen table, with 67 out of 100 capsules in the prescription remaining. (AR 131). The label on the bottle of Soma indicated the prescription had been filled/dispensed two days before, on Friday, March 24, 2006. (*Id.*). Officer Klahr stated that "[p]roviding that left over tablets from a previous script, or other unknown source, were not added to the current bottle, 33 tablets had been removed, and presumably ingested by the decedent, within a 48 hour, or less, time period."[2] (*Id.*). Officer Klahr added, "[t]his is also commensurate with the 'foam cap' on the bodily

---

[2] The court notes that the carisoprodol was prescribed to be taken at a rate of eight (8) per day. At that rate, a total of twenty four (24) tablets could properly have been taken over the three day period.

remains, which generally is indicative of a sedative overdose." (*Id*.).

An autopsy was performed on March 27, 2006. (AR 167). The Medical Examiner's Report of Laboratory Analysis, dated June 14, 2006, indicates Mr. Brimer's femoral blood tested positive for hydrocodone (less than 0.10 MCG/ML), codeine – 2.0 MCG/ML, carisoprodol – 6.9 MCG/ML, and Meprobamate[2] – 37.1 MCG/ML; and his heart blood tested positive for diazepam, nordiazepam[3], and acetaminophen. (AR 151). The lab report closes with the following comment – "significant codeine with other CNS [central nervous system] depressants." (*Id*.). At the time of his death, Mr. Brimer had recently filled prescriptions for diazepam, APAP/codeine (acetaminophen with codeine), Lipitor, Lunesta, morphine sulphate, and carisoprodol. (AR 142).

The Medical Examiner's Report of Autopsy, dated June 21, 2006, states the "Cause of Death" as "Acute combined drug toxicity" due to codeine, diazepam, carisoprodol, and hydrocodone. (AR 166-67). The Medical Examiner's final opinion in the autopsy report was: "[d]eath of this man with a history of hypertension and back pain was due to acute combined drug toxicity. There were no significant injuries. The manner of death is classified as accident." (AR 172). The police closed the investigation after receiving the Medical Examiner's Report. (AR 133). The Certificate of Death, dated July 13, 2006, similarly lists the immediate cause of death as acute combined drug toxicity due to codeine, diazepam, carisoprodol, and hydrocodone. (AR 143). The "Manner of Death" is described as "Accident." (*Id.*).

---

[2] Meprobamate is a metabolite of carisoprodol. (AR 102).

[3] Nordiazepam is a metabolite of diazepam.

4

### C. Claim Denial and Administrative History

On or about November 14, 2006, the Brimers submitted a claim under the Policy. (AR 181). LINA acknowledged receipt of the claim and then began collecting information relevant to the claim. On January 4, 2007, LINA requested a toxicological opinion from Toxicologist Frederick W. Fochtman, Ph.D. (AR 108). On January 28, 2007, upon review of the information provided him by LINA, Dr. Fochman opined within a reasonable degree of scientific certainty that "Mr. Brimer had not taken carisoprodol according to his prescribed dosage. The concentrations of codeine, carisoprodol, and meprobamate found in Mr. Brimer's post-mortem blood are greater than what would be expected with therapeutic doses." (AR 103).

LINA denied the Brimer's claim on February 2, 2007. (AR 086). LINA based its denial on Exclusion 7 of the Policy. On March 22, 2007, the Brimers appealed the denial of their claim, arguing that Exclusion 7 is ambiguous and must be construed against LINA. (AR 082). On July 12, 2007, LINA completed the administrative appeal and denied the Brimers' claim on four grounds: 1) that Mr. Brimer's death was not accidental, 2) that Exclusion 1 applied, 3) that Exclusion 6 applied, and 4) that Exclusion 7 applied. (AR 060-62). The Brimers subsequently filed this ERISA action appealing LINA's denial of benefits.

## II. Standard of Review

A Rule 59(e) motion to reconsider may be considered on the following grounds: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Resources Corp.*, 57 F.3d 941, 948

(10th Cir. 1995)). In other words, when the court has "misapprehended the facts, a party's position, or the controlling law," a motion to reconsider is appropriate. *Id.*; *see Syntroleum Corp. v. Fletcher Int'l, Ltd.*, 2009 WL 761322, at *1 (N.D. Okla. March 19, 2009). It is inappropriate, however, for a party to advance arguments that could have been raised in prior briefing. *Maul v. Logan Cty. Bd. of Cty. Comm'rs,*, 2006 WL 3447629, at *1 (W.D. Okla. Nov. 29, 2006).

### III. The Respective Burdens of Proof

The parties agree that the Brimers bear the initial burden of proving the occurrence of a covered loss. *Hancock v. Metro Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009).[4] LINA bears the burden of showing that a loss falls within an exclusionary clause of the policy. *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000).

### IV. Accidental Death

The Policy provides coverage for loss of life from bodily injuries caused by an accident. In interpreting the terms of an ERISA plan, it is appropriate to apply a *de novo* standard of review, giving "the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant . . . would have understood the words to mean." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (quoting *Blair v. Metro. Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992)).

The parties agree that the Oklahoma Supreme Court's decision in *Cranfill v. Aetna Life Ins. Co.*, 49 P.3d 703 (Okla. 2002) guides the interpretation of terms of the insurance contract. In

---

[4] The Brimers also point out a scrivener's error located on page 8 of the prior Opinion and Order. Insofar as the court reverses its opinion on the issue of accidental death, the previous error is moot.

*Cranfill*, the accident insurer argued that an insured's death was a reasonably foreseeable consequence of his driving while intoxicated, and therefore his death was not accidental. The Oklahoma Supreme Court rejected the insurer's argument that the terms of a life insurance policy are analyzed under the tort principle of foreseeability:

> Foreseeability has a more specific meaning in the context of life and accident insurance. It is only when the consequences of the act are so natural and probable as to be expected by any reasonable person that the result can be said to be so foreseeable as not to be accidental.

*Id* at 707 (citing *Mid-Continent Life Ins. Co. v. Davis*, 51 P.2d 319 Syllabus by the Court ¶ 1 (Okla. 1935) ("Death of the insured is "accidental" within policy where it is unexpected and not [the] probable result of his conduct.")). The court must therefore determine whether Mr. Brimer's death was so natural and probable a consequence of his acts as to be expected by any reasonable person.

In making that determination, "the standard to be used is that of a reasonable person appraising the event from the insured's perspective." *Cranfill*, 49 P.3d at 706 (citing *Willard v. Kelley*, 803 P.2d 1124, 1128-29 (Okla. 1990)). The court must therefore be mindful that Mr. Brimer's wife normally administered his medication. Alone for the weekend while his wife was out of town, Mr. Brimer had to self-administer a regimen of multiple medications prescribed for his hypertension and back pain.

The Brimers point to the conclusions contained in the governmental investigations – the Medical Examiner's Report of Autopsy, the police report, and the Certificate of Death – all of which describe Mr. Brimer's death as an accident. Such conclusions, though not dispositive, weigh in favor of the Brimers. Here, the Medical Examiner's final opinion was that Mr. Brimer's death was due to the acute combined drug toxicity of codeine, diazepam, carisoprodol, and hydrocodone. Although Mr. Brimer consumed more carisoprodol than his prescribed dosage, he may have taken as few as

7

nine tablets in excess of his prescribed dosage of eight tablets per day over a three day period. *See* footnote 2, supra. The record indicates that the codeine found in Mr. Brimer's femoral blood resulted from consumption of acetaminophen with codeine, which Dr. Klotz had prescribed. Dr. Klotz had also prescribed the diazepam. This court finds, by a preponderance of the evidence, that the *combined toxicity* of codeine, diazepam, carisoprodol, and hydrocodone, caused Mr. Brimer's death. And although Mr. Brimer self-administered the carisoprodol and acetaminophen with codeine in excess of their prescribed dosages, "[t]he mere fact that an insured's death [in Oklahoma] may have resulted from his or her own negligence, or even gross negligence, does not prevent that death from being accidental." *Cranfill v. Aetna Life Ins. Co.*, 49 P.3d 703, 707 (Okla. 2002).

Upon reconsideration of the administrative record and the applicable law, this court hereby reverses its previous decision on this issue and concludes that Mr. Brimer's death was an unexpected result of the combined toxicity of his self-administered drugs, and was not the probable result of his conduct. Put another way, this court concludes that Mr. Brimer's death was not so natural and probable a consequence of his acts as to be expected by a reasonable person. The Brimers have carried their burden of proving that Mr. Brimer lost his life from bodily injuries caused by an accident.

## V. Policy Exclusions

Although Mr. Brimer's accidental death is a covered loss under the Policy, the court must next address whether LINA properly denied the Brimers' claim on the basis of any one of three separate exclusions.

A. Exclusion 1

Exclusion 1 provides that no benefits will be paid for loss resulting from intentionally self-inflicted injuries, or any attempts thereat.

LINA does not defend its reliance on Exclusion 1 in its briefs before this court. LINA has therefore failed to meet its burden of showing that the covered loss falls under Exclusion 1. Moreover, the Oklahoma Supreme Court has held that a court may not infer an insured's intent to inflict his or her own death. *Cranfill*, 49 P.3d at 708. "A death is not intentionally self-inflicted for purposes of an accidental death policy merely because it resulted from engaging in negligent or even grossly negligent conduct, unless the insured intended to cause his own death." *Id..* Exclusion 1 was therefore not a legitimate basis for LINA to deny the Brimers' claim.

B. Exclusion 6

Exclusion 6, the medical treatment exclusion, provides in pertinent part, that "[b]enefits will not be paid for loss covered by or resulting from sickness, disease, bodily infirmity or medical or surgical treatment thereof, . . . regardless of how contracted."

In its previous Opinion and Order, this court held that the medical treatment exclusion applies to the Brimers' claim. Courts have consistently held that a medical treatment exclusion applies to accidental death caused by overdose of drugs prescribed by a doctor in the course of medical treatment. *Grobe v. Vantage Credit Union*, 679 F.Supp. 2d 1020, 1033 (E.D. Mo. 2010). In *Grobe*, the insured died as a result of acute methadone intoxication, where the methadone had been prescribed for the treatment of a medical condition. The court held that the medical treatment exclusion applied to exclude coverage, observing

9

> AD & D policies are intended to cover accidental deaths and losses, not all deaths and losses. The medical treatment exclusion is intended to exclude coverage for those individuals who have assumed the risks of medical treatment, including the possibility of death.

*Id.* at 1033. In *Barkerding v. Aetna Life Ins. Co.*, 82 F.2d 358, 359 (5th Cir. 1936), a patient accidentally burned his foot after following a physician's prescription to use heat on the foot, but the patient used a higher watt bulb than was necessary. The Fifth Circuit held that "[t]he excess of heat is like an overdose of a prescribed drug ignorantly taken by a patient, the effect of which is held to be the result of medical treatment" under policies excluding medical treatment. *Id.* And in *Swisher-Sherman v. Provident Life & Accident Insurance Company*, 37 F.3d 1500, 1994 WL 562050 (6th Cir. 1994) (unpublished), the Sixth Circuit addressed an exclusion for "loss directly or indirectly result[ing] from . . . medical or surgical treatment for . . . infirmity or disease." In that case, the insured was prescribed heart medication by his doctor, but he was given the wrong drug by the pharmacist and he died as a result. The Sixth Circuit noted that "such *medical* mishaps can only occur during the course of treatment" and held that negligence which occurs during the course of medical treatment falls within the scope of medical treatment exclusions. *Id.* at 2. Although the negligence in the instant case was the insured's, and not that of a pharmacist or physician, the medical treatment exclusion still applies.

LINA did not raise the medical treatment exclusion as a bar to the Brimers' claim until it denied the Brimers' administrative appeal. The Brimers understandably object, as LINA effectively denied the Brimers their right under ERISA to an administrative appeal of the adverse benefit determination as premised on the medical treatment exclusion. *See* 29 C.F.R. § 2560.503-1(g) and (h).

LINA argues that the Brimers had a full opportunity to address the medical exclusion as an additional ground for denial before LINA issued its final decision. The argument misses the mark, for the following reasons. LINA first denied the claim, based on Exclusion 7 only, on February 2, 2007. The Brimers appealed the decision on March 22, 2007. On June 15, 2007, LINA wrote the Brimers apologizing for the delay in making a decision on their claim and asking the Brimers for additional information, including "any information which you feel supports the fact that: . . . Mr. Brimer's death was not the result of a medical or surgical treatment or the result of a sickness, disease or bodily infirmity." Although it is now clear that the request for information pertained to the medical exclusion LINA later asserted, the Brimers had no reasonable basis to know that they were under an obligation at that time to address additional grounds for the adverse benefit decision.

In cases where a plan has failed "to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue [a civil action in federal district court]." 29 C.F.R. § 2560.503-1(l). The Ninth Circuit has held that the failure by an administrator to allow full and fair review of a denial decision, required under ERISA, by adding a new reason for denial in its final decision, entitles a claimant to present additional evidence in district court and to have the district court consider it. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008). "[A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006)(en banc).

The Brimers now argue they had no opportunity to present additional evidence to address Exclusion 6. However, the Brimers never sought leave to present additional evidence to this court. Moreover, the Brimers never apprised the court of their claimed right to present additional evidence. This point of law was first raised by the court *sua sponte* in its Opinion and Order of September 13, 2010. Prior to their Motion for New Trial, the Brimers only argued that "[f]undamental fairness dictates that Defendant be held to its initial decision [based on Exclusion 7 alone]." They did not argue that they ought to be permitted to present additional evidence to this court.[5]

Finally, and perhaps most importantly, the Brimers do not suggest the existence of any relevant evidence outside the administrative record that may have a bearing on the issue of whether Exclusion 6 applies. This court has determined that Mr. Brimer's death was caused by the acute combined toxicity of prescribed medications. The issue of whether the medical treatment exclusion applies to accidental death caused by overdose of drugs prescribed by a doctor in the course of medical treatment is essentially one of law. The Brimers do not point to any additional relevant evidence not already presented to this court that might alter its conclusion.[6] Therefore, the court declines to reopen the case to permit the Brimers to present

---

[5] The court's standard ERISA Scheduling Order entered in this case contained the statement that the "court's review will be limited to the administrative record, and no further discovery is required." (Dkt. #24). However, the Brimers neither apprised the court they ought to be allowed to supplement the record, nor did they seek leave to supplement the record at any time prior to their Motion for New Trial. The Brimers do not argue that it is the court's duty to invite additional evidence, as opposed to their responsibility to seek leave to supplement the record. The court notes that it did not foreclose the Brimers from obtaining discovery in this action, as they prevailed on their objection to LINA's Motion for Protective Order. This court entered an Order denying LINA's motion (Dkt. #22) and directed LINA to respond to the Brimers' discovery requests. Nothing in the Brimers' discovery requests pertained to the Medical Treatment Exclusion.

[6] In *Saffon*, supra, the Ninth Circuit held that the district court had to give Saffon an opportunity to present evidence on the one issue that was newly raised in MetLife's denial letter – the results of a Functional Capacity Evaluation or other objective evidence of whether Saffon was totally disabled under the terms of the Plan. The procedural irregularity caused when MetLife added a new reason for denial prevented full development of the administrative

additional evidence.

In their reply on the Motion for New Trial, the Brimers raise for the first time an argument that Exclusion 6 should be read out of the policy because it conflicts with Exclusion 7. *See Clark v. Metro. Life Ins. Co.*, 369 F.Supp. 2d 770 (E.D. Va. 2005). Because the argument was not raised until the reply on the new trial motion, the court declines to consider it.[7]

### C. Exclusion 7

Exclusion 7 provides that no benefits will be paid for loss resulting from "[v]oluntary self-administration of any drug or chemical substance not prescribed by, and taken according to the directions of, a licensed physician."

In its previous Opinion and Order this court concluded that, because Exclusion 6 was determinative, the court did not need to address the issues presented in connection with Exclusion 7. In their Motion for New Trial, the Brimers urge the court to address the exclusion, and the court now does so in the interest of finality on possible appellate review.

In interpreting an insurance contract a court must determine the parties' intent at the time they entered into it. *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependant Life Ins. Plan*, 605 F.3d 789, 801 (10th Cir. 2010). Because an accident policy is drafted by the insurer, however, the court's inquiry is not what the provider unilaterally intended

---

record because it prevented Saffon from obtaining the Functional Capacity Evaluation that MetLife claimed to need. 522 F.3d at 872. This case is distinguishable insofar as there is nothing to suggest that the procedural irregularity in this case prevented full development of the administrative record.

[7] As previously stated, it is improper for a party to raise arguments in a Motion for New Trial that could have been raised in prior briefing. *Maul v. Logan Cty. Bd. of Cty. Comm'rs,*, 2006 WL 3447629, at *1 (W.D. Okla. Nov. 29, 2006). This particular argument was not raised until the reply. The court notes that the court in *Grobe, supra,* declined to follow *Clark's* reasoning. 679 F.Supp.2d at 1032.

13

the terms of the accident policy to mean, but what a reasonable person in the position of the participant would have understood those terms to mean. *Id.* Where there is an ambiguity or conflict in the policy's terms, "a policy of insurance is to be construed strictly against the insurer and in favor of the insured." *Flores v. Monumental Life Insurance Co.*, 620 F.3d 1248, 1250 (10th Cir. 2010), *quoting Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 868 (Okla. 2003).

Both parties cite a relatively recent decision from the Western District of Oklahoma, but they come to different conclusions as to the application of its reasoning to this case. In *Howland v. Am. Fid. Assurance Co.*, 2006 WL 2434307 (W.D. Okla.), the court addressed a policy exclusion nearly identical to Exclusion 7 here. The only difference between the two exclusions is that Exclusion 7 includes a comma between the words "directions of" and "licensed physician." The *Howland* court held that the language of the exclusion was ambiguous and construed the ambiguity against the accidental death insurer as drafter of the policy:

> In this case, the language of the exclusion is ambiguous. Read literally, the exclusion appears to exclude loss related to non-prescribed drugs taken according to the directions of a licensed physician, a situation unrelated to the circumstances of Mr. Howland's death. The exclusion could also possibly be interpreted to exclude loss related to use of prescribed or non-prescribed drugs taken contrary to the directions of a licensed physician and/or any loss related to taking a non-prescribed drug. However, these interpretations essentially require the court to rewrite at least some terms used in the provision. Unless rewritten, the exclusion does not logically or reasonably conform to the defendant's suggested interpretation that loss attributable to prescribed medication taken contrary to the directions of a licensed physician is excluded. Given that the exclusion specifically refers only to "non-prescribed" drugs, a reasonably policy holder would not understand the exclusion to preclude loss related to prescribed medication.

*Id.* at *3.

LINA argues that the addition of the comma to Exclusion 7 "is significant, as it indicates

14

that the proposition 'not' modifies both 'prescribed by' and 'taken according to the directions of,' such that the sentence logically reads '[n]o benefits will be paid for loss resulting from . . . [v]oluntary self-administration of any drug or chemical substance not *both* prescribed by, and taken according to the directions of, a licensed physician.'" (emphasis added). This court agrees that if LINA had added the word "both" together with the additional comma, it might have rescued the exclusion from its ambiguity. As written, however, the exclusion is ambiguous. It appears to exclude loss related to non-prescription drugs taken according to the directions of a licensed physician. Unless rewritten, a reasonable policyholder could read the language to exclude loss relating only to non-prescribed drugs or chemical substances. As a matter of law, the ambiguity must be construed against the insurer. LINA therefore has failed to meet its burden of showing that the loss falls within Exclusion 7.

### VI. Conclusion

Upon reconsideration and review of the record and the applicable caselaw, this court has revised its determination on the issue of accidental death. This order shall therefore modify and supercede the previous Opinion and Order at Docket No. 36. However, this decision does not merit a substantive alteration of the Judgment entered September 13, 2010. Therefore, the Motion for New Trial (Dkt. #38) is denied.

DATED this 11th day of February 2011.

_Gregory K. Frizzell_
Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma